GILBERT v. GULF OIL CORPORATION.
No. 5855.

United States Court of Appeals
Fourth Circuit.

Argued April 7, 1949.

Decided June 2, 1949.

Max J. Gwertzman, New York City (William S. Mundy, Jr., and E. Marshall Frost, Lynchburg, Va., on the brief), for appellant.

Samuel H. Williams, Lynchburg, Va., and R. F. Carter, Houston, Tex. (J. E. McAshan, A. R. Martin and Archie D. Gray, Houston, Tex., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought to recover damages which were suffered when a five story public storage warehouse and its contents were destroyed by fire on March 8, 1944, at Lynchburg, Virginia. Cornelius Gilbert, the owner of the warehouse, claimed damages for himself and for his customers in the sum of $365,529.77 against the Gulf Oil Corporation on the ground that the fire followed an explosion which was caused by negligence in the delivery of gasoline on the premises by Jennings-Watts Oil Co., Inc., a local distributor of the defendant's products. The question of the defendant's liability, but not the amount of the damages, was submitted to the jury which found for the defendant. The plaintiff contends on this appeal that the District Judge erred in refusing to direct a verdict in his favor, in admitting as evidence the opinions of certain members of the city fire department as to the cause of the fire, and in ruling upon the propriety of certain arguments offered by the attorneys to the jury.

The explosion occurred while a delivery truck was supplying gasoline to a storage tank installed beneath the floor of the basement of the building. The truck had backed part way into one of two driveways located inside the building on the first floor and separated by a loading platform 3 or 4 feet high. The flooring of the driveways and the sides of the platform were made of 3 inch straight edge boards with narrow cracks between them. A fill pipe 11 feet long with an inside diameter of 2 inches extended vertically from the storage tank in the basement to a point near the top of the basement beneath the loading platform. This pipe was accessible through a small removable hatch or trap door in the side of the platform. During the delivery of gasoline one end of a hose was coupled to a spigot on the back of the truck and a nozzle 1⅞ inches in exterior diameter was inserted into the end of the fill pipe. Means for the escape of gasoline vapor under pres-

sure from the tank was provided by a vent pipe which ran from the tank through the front wall of the building to a point 13½ feet above the street level. This pipe was 3 inches in diameter at the tank and 1 inch in diameter at the other end. There was also a suction pipe through which gasoline was withdrawn from the tank by a pump on the platform and a return line for the return of excess gasoline to the tank. A coal furnace for heating the offices was located in the basement 45 feet from the front wall of the building.

On the day of the fire the delivery truck was in charge of a driver skilled in driving trucks but with somewhat less than four months' training and experience in handling deliveries from a gasoline truck. He was instructed to deliver 250 gallons on this occasion. According to his testimony, he connected the truck to the fill pipe by hose in the usual manner, turned on the spigot in the rear of the truck, and then while the gasoline was running, left the truck unattended and went to the office of the storage warehouse to collect payment for the gasoline. He had not been instructed that he should not leave the truck while gasoline was flowing from the spigot. While he was still in the office, and before his business was completed, the explosion occurred and flames shot up the elevator shaft so rapidly that the building and contents were completely destroyed despite the efforts of the city firemen who promptly responded to the automatic alarm.

Witnesses testified that when the explosion occurred, they saw a ball of fire about the size of a flour barrel at the rear of the truck, and then a flame which burned about the truck. This was soon quenched and a fireman was able to drive the truck from the building under its own power; but in the meantime the fire had spread to the upper floors. The back part of the truck was burned and its brake hose was severed by the flames. The testimony was conflicting as to whether a part of the delivery hose was attached to the truck when it was driven out of the building. When the rubble in the basement was excavated some weeks after the fire, there were found a rubber hose with spiral wire reinforcements connected to a nozzle consisting of an elbow and a 1½ inch pipe, and also a second nozzle to which was attached a small piece of charred canvas hose. The truck customarily carried two hoses, one of rubber and one of canvas; and the testimony is conflicting as to whether the rubber or canvas hose was used on this occasion. The fill pipe and the furnace were found to be in good condition but no nozzle was found in the fill pipe.

It is agreed that the explosion probably occurred by the ignition at the furnace of gasoline fumes which, being three times heavier than air, settled into the basement. The conflict comes as to the reason for the presence of the fumes near the furnace, and on this point differing opinions were expressed by qualified scientific experts. The plaintiff's theory was that the delivery hose was carelessly coupled to the truck and came loose in the absence of the driver so that gasoline was spilled on the floor of the driveway and seeped through the cracks into the basement. In support of this theory the plaintiff points to testimony tending to show that the hose if properly connected to the truck would stand a tension of 1,000 pounds before parting, and yet the truck was driven out of the driveway after the explosion without difficulty; that no hose was attached to the truck when it was driven out, and that a reinforced rubber hose with both nozzle and coupling attached was found in the rubble in the warehouse basement. The "ball of fire" is said to be the result of the tendency of gasoline vapors when exploded to flash back to the point of origin of the fumes, and consequently the fire in the rear of the truck indicates that the source of the vapor was near the point where the delivery hose was normally coupled to the truck and the presence of fire in this proximity is indicated by the severance of the brake hose underneath the body of the truck.

Finally, the plaintiff contends that the defendant's explanation that the fumes reached the basement from the end of the fill pipe, when they were forced out of the tank by the entering gas, is untenable, since the fumes would have found escape

more easily through the vent pipe than through the fill pipe in view of the small space remaining when a nozzle 1⅞ inches in diameter was inserted in the fill pipe 2 inches in diameter. In this connection it is pointed out that the fill pipe was located outside the building until 1936 or 1937 when it was moved because it was damaged by vandals and that on this occasion the Standard Oil Company, which was supplying gasoline to the premises at the time, relocated the pipe 5 feet inside the building line; and that the defendant began to supply gasoline to the premises in 1938 and for the purpose placed a new pump on the premises for use in connection with the existing installation and the inside fill pipe without warning the plaintiff that the installation was in any way dangerous, and since that time has used the installation many times for the delivery of gasoline without accident of any kind.

The defendant on the other hand stresses the fill pipe theory. It contends that since gasoline is heavier than air the fumes would not seek exit from the storage tank through the vent pipe but through the fill pipe, a lower point in the system; and that the plaintiff was negligent in erecting an installation which allowed the escape of vapors into the basement where the furnace fire was located. Defendant contends that it had no part in relocating the fill pipe inside the basement and no occasion to examine the basement when it substituted its pump for that of the Standard Oil Company, and that the driver had no reason to believe that the fill pipe was located in the same room with the furnace. The defendant, moreover, points to the evidence tending to show that a fragment of the supply hose was still clinging to the truck when it was driven out after the explosion, and since the brake hose was burned by the fire, the delivery hose attached to the back of the truck might have been severed in the same way; that gasoline explosions do not necessarily flash back to the point of origin; and that there was very little fire on the floor of the driveway, and no evidence of fire in the basement to which gasoline flowing through the cracks of the floor of the driveway would have had access.

This résumé of the evidence and of the conflicting claims of the parties sufficiently indicates that the contention of the plaintiff that the fire was caused solely by the defendant's negligence, and the contention of the defendant that the fire was caused in whole or in part by the negligent installation by the plaintiff of the fill pipe for the delivery of gasoline, involved questions of fact which were properly submitted to the decision of the jury. Accordingly, we find no error in the refusal of the judge to instruct the jury to find a verdict for the plaintiff.[1]

The plaintiff complains as to the admission in evidence of the opinion of T. A. Hunter as to the cause of the fire. Hunter had been a member of the fire department for about 15 years. In 1944, when the fire occurred, he had the rank of lieutenant, and on April 5, 1944, after the fire, he was appointed fire prevention officer. He was not on duty on March 8 but got to the building 45 minutes after the fire started and after it had been extinguished on the first floor and the gasoline truck had been driven out of the building. He circled the building and entered nearby structures to ascertain whether they were in danger. He was able to see only a little of the first floor on account of the smoke. He was instructed by the fire chief to investigate the cause of the fire, together with a city detective. They were not able to enter the building until after March 15 when they observed that the walls in the basement had been dislodged by the explosion and that the planking of the driveways was charred but not burned. He saw the outside fill pipe on the sidewalk between the two driveways and supposed that it was in use. He was not shown the inside fill pipe. He saw the outside vent pipe but made no examination to see whether it was open or clogged up, since

---

[1] See Note 151 A.L.R. 1261 for a collection of cases as to the standard of care required in the delivery and storage of petroleum products.

it was high up and hard to reach. Such was the substance of the testimony he had given when he was asked and permitted over objection to testify that he made a verbal report to his chief that in his opinion the fire was caused by the ignition of gasoline vapor which escaped from the end of the fill pipe and found its way to the furnace in the rear of the basement.

On cross-examination little else was brought out as to the character or extent of the factual basis considered by the witness in forming his opinion. It was shown that he had taken statements from a number of witnesses before he made his report on March 15 or 16, but except for a general statement by the plaintiff·as to the fact of the explosion, which threw no light on its cause, the record does not show what information the witness derived from the statements or whether it was such information as was proper to be considered in making up the opinion. The witness admitted that he did not see the fill pipe after it had been freed from the debris, or the hose that was found in the cellar, and he conceded that "possibly" he did not make a very careful investigation as to the cause of the fire and that at the time of the fire he did not know anything about the chemistry of gasoline or that gasoline vapor is three and a half times heavier than air.

■ Under these circumstances, the evidence of the witness should have been excluded from the jury. We are in accord with the general trend of modern authority which holds that questions as to the admissibility of expert testimony should be left to the wise discretion of the trial judge. White v. State of Md. to the Use of Anderson, 4 Cir., 106 F.2d 392, 397; United States v. 25.406 Acres of Land, 4 Cir., 172 F.2d 990. But in the exercise of this discretion, the court must still determine whether the subject matter of the suit is such that the issues cannot be properly understood or determined without the aid of opinions of persons of special knowledge or experience, whether the expert offered as a witness is qualified to express such an opinion, and whether he has sufficient acquaintance with the basic facts, either through personal ob-

servation or on the basis of a proper hypothetical question, to enable him to do so. There is no question in this case that expert testimony was needed to guide the jury in their deliberations. It was used without objection on both sides. Moreover, the testimony of an experienced fireman may properly be received when it consists of an opinion as to circumstances which fall within the scope of his experience. Gechijian v. Richmond Ins. Co., 305 Mass. 132, 25 N.E.2d 191; Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co., 237 Mo.App. 511, 175 S.W.2d 930; 32 C.J.S., Evidence, § 546, p. 337, Note. 52.

■ In the pending case, however, no effort was made to ascertain the competence of the witness and it does not appear from the record that he was sufficiently familiar either with the properties of gasoline or with the essential facts of the case to express an opinion upon the source of the fire. He admitted that he did not know the properties of gasoline at the time of the fire and that he was not familiar with physical evidence that was available and that his investigation had not been thorough. It is well established by the weight of authority that expert testimony may not be received unless it appears that the witness is in possession of such facts as would enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. Marshall v. Sellers, Md.1947, 53 A.2d 5; 20 Am.Jur. §§ 793, 795. Some discretion may be allowed to the trial court as to whether the factual basis for the opinion shall be disclosed before the opinion is expressed, Wigmore, Evidence, (3d Ed.) § 1922; State v. Hightower, 187 N. C. 300, 121 S.E. 616; See 20 Am.Jur. § 793; but it is obvious that the witness should not be allowed to express an opinion on an inadequate basis or in respect to facts which are not disclosed to the jury. The testimony under examination does not meet this test.

■ For like reasons it was also erroneous to receive in evidence a letter from M. K. Evans, the chief of the fire department, and the witness Hunter, as inspector, to the defendant in which the sign-

710

ers expressed the opinion that the gas fumes backed out of the fill pipe and into the furnace causing the explosion and the fire. It seems that the letter was received in evidence on the ground that it was admissible under the provisions of the statute, 28 U.S.C.A. § 1732, which provides in substance that any writing or record is admissible in a court of the United States which is made as a memorandum or record of any act, transaction or event, as evidence thereof, if it is made in the regular course of business and if it was the regular course of such business to make such memorandum or record at the time of the act or event or within a reasonable time thereafter. The circumstances of the case, however, do not bring the letter within the statute. It was apparently written by the local fire department at the request of one of the litigants to secure exoneration from liability for the fire. It was not written as a regular incident in the course of a departmental investigation of the catastrophe, and it does not appear that it was written in the regular course of business. The statute was enacted to obviate the difficulties that flowed from the ancient rule in regard to the authenticity of written documents and "to facilitate the admissibility of records which experience has shown to be quite trustworthy", and it would be a perversion of this purpose to apply the statute to reports of accidents which may well become the subject of litigation. Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. See also cases cited, 28 U.S.C.A. § 695.

Nor does the letter qualify under the "official statement" or "public document" exception to the hearsay rule. This is designed to obviate the constant attendance of public officers in court to prove routine matters, Wigmore, Evidence, (3d Ed.) § 1631, whereas in the instant case the signers of the letter were available as witnesses and present in court. Furthermore, as pointed out in Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 572, 153 A.L.R. 156, "expressions of opinion

and conclusions on causes and effects based upon factual findings are not always admissible as public records, especially when it is shown either that the conclusion or opinion which the statement purports to convey would not be admissible in evidence if tendered by the direct testimony of the maker, or if the denial of the right of cross-examination could result in the perversion of the rule of trustworthiness and reliability. See Kansas City Life Ins. Co. v. Meador, 186 Okl. 397, 98 P.2d 20." See also, Illinois Power & Light Corp. v. Hurley, 8 Cir., 49 F.2d 681; Note 153 A.L.R. 156; 20 Am.Jur. § 1027; 1948 Cum.Supp. § 1027.

The testimony of the firemen was undoubtedly prejudicial to the plaintiff's case. They offered the unanimous opinion of practical men in official life in the local community, in contrast with the conflicting views of the scientific experts; and the importance of the testimony was heightened by the improper appeal to local prejudice which was freely made by the attorneys for the defendant in their closing argument. The jury were told for instance that the real defendant was not the Gulf Oil Corporation but the local distributor who had agreed to indemnify the defendant for liability arising from neglect of the local company, and that the real plaintiff was not the owner of the warehouse but the out-of-state insurance companies represented by the New York lawyer who had addressed them. The District Judge cautioned the jury that the question of whether or not insurance companies were interested in the result of the accident was immaterial, and should not influence the jury in the least since every litigant was entitled to fair and equal justice in the court. This instruction of course was eminently proper but we do not think that it was sufficient to overcome the harmful effect of the improperly admitted testimony coupled as it was with the obvious intent of the defendant's attorneys to divert the jury's attention from the real issue in the case.

Reversed and remanded.